**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,      :

       Plaintiff,        :      Case No.  2:23-CR-243

   vs.
                   :

JOHN CASTILLO,               JUDGE SARGUS

       Defendant.      :

**SENTENCING MEMORANDUM FOR JOHN CASTILLO**

Now comes Defendant, John Castillo, through counsel, and hereby submits the following Sentencing Memorandum in support of a sentence below the guidelines range, which is sufficient, but not greater than necessary to comply with the purposes of 18 U.S.C. Sec. 3553(a).

**1. Introduction**

From the time he was a young boy, John Castillo wanted to become a law enforcement officer. He first applied to the Columbus Police Academy in 2015, when he was 23 years old. He was unsuccessful at first, failing the written entrance examination twice, and receiving a citation for drag racing during the application process. John did not give up, however. He finally passed the written test, the physical test, the lie detector test, the psychological test and the stress test. After sitting for the Oral Board Review, he was officially hired and entered the Academy on June 17, 2019.

Thirty-two weeks later, he graduated with about forty fellow rookie officers. The new officers were considered "probationary" officers for the first year, beginning when they entered the Academy. John, like many of his fellow officers, was given regular Patrol duties. He worked

with several training officers who rode with him in marked cruisers and taught him how to be a patrol officer.

Several months later, a position became available in the CPD Drug Cartel Unit. Although that position was usually filled with officer who had twenty or more years of experience, John was persuaded to apply, since he spoke Spanish. One of John's training officers, Lt. Sweeney, knew Detective John Kotchkoski (Kotchkoski) and put in a good word for him. John was interviewed by Detectives Kotchkoski and Marco Merino. They questioned him about "having their backs" if an Internal Affairs investigation was conducted into their actions. They informed him that sometimes, police officers had to lie for their partners.  Around September 2020, John was given the assignment and promoted to detective.

It soon became clear that Detective Kotchkoski ran the unit, and had convinced his superiors, Sgt. Eric Moore (E. Moore), as well as his Commander, to allow John into the unit. Mr. Castillo later learned that E. Moore and Kotchkoski went back a long way with Kotchkoski supposedly lying for E. Moore during an EEO investigation.

Kotchkoski made sure that John and fellow officer Coronado (Coronado), who joined the unit at the same time as John, owed him their jobs.  Once in the unit, John was supervised by Kotchkoski while Officer Coronado was supervised by Detective Rich Moore (R. Moore.) Kotchkoski repeatedly warned John not to talk to other officers. John was told that other officers were jealous of their unit, since the Cartel Unit made all the big busts. Kotchkoski also informed John that if he talked to other officers, he would be kicked out of the unit and Kotchkoski would make sure that no one would ever want to work with him again.

Kotchkoski decide the hours and targets that the unit would work. Members did not show up for roll call like other officers. They reported directly to the Narcotics unit that was housed in another part of the city away from headquarters.

Shortly after joining the Drug Cartel Unit, John was involved in an investigation into a person suspected of trafficking drugs. A search warrant for the suspect's house was obtained and a GPS device had been placed on the suspect's truck. The search warrant was executed at the same time that patrol officers pulled over the suspect on Sawmill Road, in Columbus, Ohio. Most of the Cartel Unit responded to the traffic stop location. John, Coronado, and R. Moore went to the suspect's house.  R. Moore told John and Coronado that Kotchkoski had debriefed the suspect and was told that the drugs were in the bedroom closet. John, R. Moore and Coronado searched but could not locate any drugs. Kotchkoski arrived, and went into the bedroom alone. He returned with a baseball-sized ball of heroin and about fifteen thousand dollars in cash. He gave the drugs and cash to R. Moore and Coronado to turn into the property room, and then told Castillo to go with him to the traffic stop location to retrieve the GPS device. Once back at the truck, Castillo located two GPS tracking devices on the truck, which he removed. He asked Kotchkoski if the truck was going to be impounded. Kotchkoski said the truck was going to the C.I. as payment. Kotchkoski called R. Moore, who was still at the suspect's house to see if he had located the title to the truck. When Castillo and Kotchkoski left the scene, Kotchkoski placed the keys to the truck inside the vehicle.

The following day, John asked Coronado if he thought something was wrong with the situation involving the truck. Coronado had asked R. Moore about it, and was told that "there are certain things that you will not understand."

3

In February, 2021, Castillo was involved in an investigation involving a suspect who lived on N. Everett Street in Columbus, Ohio. As Castillo was surveilling the suspect's residence, he was notified that the suspect had been pulled over by CPD patrol, and he was to go to that location. When he arrived, the suspect was in the rear of the police cruiser. John watched the patrol officer hand a bag of money to Kotchkoski, who was already there. Kotchkoski gave the bag to John and directed him to give it to R. Moore. Kotchkoski then moved the suspect into an unmarked police car and began questioning him. Castillo got into the back seat with the suspect. He heard Kotchkoski tell the suspect to "call him and tell him to drop it off." At this point, Castillo had no idea what was going on. They drove back to the suspect's house and waited outside in the car. He heard the suspect talking on the phone to another person, directing him to "throw it in the yard."

Kotchkoski got out of the car, leaving Castillo with the suspect in the car. Kotchkoski went to the back yard and returned with a box, which he placed in the trunk of the car. Castillo never saw what was in the box, nor did he handle it. Kotchkoski then told the suspect "you better say drugs are in the house." Kotchkoski, Castillo and the suspect all went to the front door, into the house and into the basement. Kotchkoski showed the suspect where he was supposed to say that the drugs were hidden in his house.

They left the residence, and Coronado, who was not there, was informed that the suspect gave permission to search the house. Coronado went through the house and located the drugs.

Later, as everyone was leaving, Kotchkoski told Castillo that he wasn't feeling good, and that he might have come into contact with fentanyl. He told Castillo to follow him to his house in Marengo, Ohio. At that point, John realized that the drugs in the back of Kotchkoski's car would never be placed in the property room.

4

John followed Kotchkoski to his residence. He followed Kotchkoski inside, where he stayed for only a few moments. He felt sick, and only wanted to go home. He knew that he and Coronado had been used by Kotchkoski. John went home, but couldn't sleep. He got up early and went to work.

John was approached by Kotchkoski that morning who informed him that they were going to search a storage unit. On the way there, John asked him if he had a warrant. Kotchkoski said that he did, but John wasn't sure he believed him. When they arrived, Kotchkoski had the keys to the unit. He opened the door and directed Castillo to look around "for anything valuable." John saw Kotchkoski take a small fanny pack. Several guns were found in the storage unit, but they were not taken. Kotchkoski told John "I can have someone break into here to get the guns."

A few days later, John got COVID. He was of work for three weeks. Kotchkoski kept calling him to get together. Kotchkoski came by his house, and asked to speak to him alone. Johns' wife went outside to give them privacy. Kotchkoski then presented John with a bag that had "lots of money" in it, saying "this is for you." Kotchkoski then left abruptly. When Castillo's wife saw the money, she started crying, afraid for husband, as he had never been involved with anything like this before.

Two days later, the Drug Cartel Unit was doing surveillance on a suspect. John radioed Kotchkoski and arranged to meet him. When they got together, John gave him the money back, and told him he was going to try to go back to patrol. Kotchkoski told him he would regret it, and that if he ever says anything to anyone, his family would be killed. John knew that Kotchkoski's girlfriend and her brothers were connected to the Mexican cartel, so he took the threat seriously.

For the next week, Castillo attempted to avoid Kotchkoski. At the same time, Kotchkoski

was constantly contacting Castillo, inviting him to lunch and wanting to "hang out." Castillo knew that Kotchkoski was attempting to determine whether Castillo remained loyal, or would be a problem. On February 13, 2021, Castillo went to Value City Furniture to look at bedroom furniture. Kotchkoski went with him. When Castillo picked out furniture to purchase, Kotchkoski paid for it, and said it was his gift. This was not planned, and it had never been discussed. Castillo did not want to accept this "gift," but was afraid that if he didn't, Kotchkoski would decide that he was a problem, and Kotchkoski had already told him what would happen to his family. Although Castillo had no direct knowledge that the funds used to pay for the furniture came from the sale of the narcotics that were stolen ten days earlier, he knew that the drugs did not get turned into the property room, and concluded that Kotchkoski had probably sold them. He knew that he should not have let Kotchkoski pay for the furniture, but was afraid to stop it. At no time did Kotchkoski and Castillo discuss selling the drugs, nor did Castillo know about Kotchkoski's arrangement with a confidential informant (Person D) that involved illegal drug trafficking.

Due to the stress of working with Kotchkoski, John arranged to take some time off and travel to Canada. He did his best to make Kotchkoski believe that everything was fine and they were still o.k.

Shortly before his Canada trip, Kotchkoski got the whole Drug Cartel Unit together and cajoled them into filing an EEO complaint. Kotchkoski told the unit that because they were Latinos, their hours would be cut. Also, the variable schedule that they enjoyed would be changed to regular hours. He told them that because they were Latinos, they got the last pick when it came to using undercover cars. Kotchkoski told them that Sgt. E. Moore had encouraged them to file the EEO complaint, and that E. Moore would be filing a lawsuit.

6

Based on this information, John filed a complaint. He met with the EEO representative and told her that Latinos were being treated differently.

While John was in Canada, he spoke with Coronado, who told him that Kotchkoski had lied. John immediately called the EEO representative and told her that his prior statement was untrue. He asked for help in getting transferred out of the Drug Cartel Unit. Shortly after his return from Canada, John was informed that he was being transferred to the INTAC unit, where he would be part of a team making forcible entries into drug trafficking houses filled with dangerous felons, armed with guns, who did not wish to be arrested. He was relieved that his new position would be less stressful.

John recognizes that he violated an important public obligation and must be punished. He also recognizes and admits that he, in fact, violated the law. Shortly, he will stand not only before this Court, but before his family, the people of the State of Ohio and his God, and ask, ultimately, for forgiveness and to be allowed to earn redemption, but in the meantime, for leniency, compassion and mercy. He will recognize that he erred; he will confirm that he accepts responsibility for his actions; he will bow his head in shame and humility and ask that this Court consider a sentence well below the proposed United States Sentencing Guideline level (hereinafter referred to as "USSG."). He will not justify his actions as they are not justifiable; he will seek to explain his actions, but not excuse them. He will not ask the people of the State of Ohio or this Court to trust his remorse as he recognizes that he has betrayed that trust---the trust he had in himself and the trust he had as a law enforcement officer.. He has recognized the abject stupidity of his actions. Mr. Castillo merely asks that the Court sentence him as an individual devoid of public sentiment and pressure; devoid of unjustified emotion; devoid of anger. Mr. Castillo recognizes, as he must, that he will—and deserves to be---incarcerated. It is anticipated

7

that the defense and the Government will not concur as to what represents a sufficient sentence and appropriate prison term.

The Pre-Sentence Report (PSI) suggests that Mr. Castillo be sentenced in accordance with the Guideline range of 57 to 71 months of imprisonment. The PSI does a largely accurate job of detailing the offense conduct, but fails to accurately describe Castillo's lack of knowledge or planning during the offense conduct.

## 2. Procedural And Factual History

Mr. Castillo is a 32-year-old former resident of Columbus Ohio. He has been denied bail and is currently being held in a U.S. Marshal's contract facility.

On June 12, 2024, Mr. Castillo entered into a plea agreement with the Government pursuant to Fed. R. Crim. P 11(c)(1)(A) and plead guilty to the one count Indictment which charges the Defendant with Possession with Intent to Distribute 5 Kilograms or more of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii).

## 3. Plea Agreement

For the purposes of sentencing, and subject to the approval of and acceptance by the Court, the Government and Mr. Castillo entered into a plea agreement pursuant to Fed. R. Crim. P 11(c)(1)(A). The Plea Agreement provides that the parties will jointly recommend that the Court make the following findings and conclusions as to the Guidelines:

a) The parties agree that, pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(5), the Defendant's relevant conduct for Count 1 is 10 kilograms of cocaine. Accordingly, pursuant to U.S.S.G. § 2D1.1(c)(5), the Base Offense Level is 30.

b) The parties agree that, pursuant to U.S.S.G. § 2D1.1(b)(18), if it were determined that the Defendant meets all the criteria of U.S.S.G. § 5C1.2, the Defendant would be entitled to an additional 2-level decrease in his offense level.

c) The Defendant retains discretion to argue that the two-level downward adjustment in U.S.S.G. §3B1.2(b) applies, and the United States retains discretion to oppose

the adjustment.

d)  The parties agree that, pursuant to U.S.S.G. § 3B1.3, the offense level should be increased by 2 levels because the Defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense.

e)  The USAO does not oppose a 2-level reduction in offense level pursuant to U.S.S.G. § 3E1.1 based upon the Defendant's acceptance of responsibility, provided that the Defendant's conduct continues to demonstrate compliance with the terms of § 3E1.1. The Defendant may be entitled to an additional 1-level decrease pursuant to U.S.S.G. § 3E1.1(b) in recognition of the Defendant's timely notification of his intention to plead guilty.

f)  The parties agree that, pursuant to U.S.S.G. § 4C1.1, if it were determined that the Defendant meets all the criteria of U.S.S.G. § 4C1.1(a), the Defendant would be entitled to an additional 2-level decrease in his offense level.

g)  The parties agree that no other upward or downward adjustments or departures apply.

h)  No determination of any of the factors in U.S.S.G. Chapter 4 regarding criminal history has been made.

## 4. Presentence Investigation Report

The Presentence Investigation Report (PSR) recommends an adjusted guideline range of 57 to 71 months of incarceration.  The Office of Probation calculates the Guideline Level as follows:

(i) Base Offense Level                                                    30

(ii) Specific Offense Characteristics

      (a) §§ 5C1.2 and 2D1.1(b)(18), (safety valve)            -2

(iii) Adjustments

      (a) § 3B1.3 (public trust)                              +2

    (b) §§ 4C1.1(a) and (b) (zero point)              -2

    (c) §§ 3E.1.1(a) and (b) (acceptance)          <u>-3</u>

  (iv) Total Offense Level                      25

## 5. Objections to Pre-Sentence Investigation Report

The defendant objects to the absence of a two-level role adjustment for being a minor participant pursuant to U.S.S.G. § 3B1.2.

Application Note 3(C) to §3B1.2 provides a non-exhaustive list of factors for the court to consider in determining whether to apply a mitigating role adjustment and, if so, the amount of the adjustment:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity.

In this case, Castillo had very little understanding of the scope of the criminal activity that Kotchkoski was involved in. Castillo's first interaction with Person A was when he was directed to travel to the location of the traffic stop. Kotchkoski was already there. Castillo did not know that Person A had retrieved a bag from a vehicle at the business that contained drug sale

proceeds. Castillo did not know that Person A had given multiple kilograms of cocaine to Person C to hold for him. Castillo did not direct Person A to call Person C to deliver the cocaine. Kotchkoski did. Castillo did not place 10 kilograms of cocaine in the trunk of the vehicle, Kotchkoski did. Kotchkoski planted the two kilograms of cocaine in the house. Castillo saw this, but never touched the cocaine. Castillo did follow Kotchkoski to his house, but he did not take the cocaine into Kotchkoski's basement to be stored. Castillo did go with Kotchkoski to search a storage unit, but was told that Kotchkoski had a warrant. Castillo did not remove anything from the storage unit. Kotchkoski did. Castillo did not arrange for anyone else to break into the storage unit to retrieve firearms. Kotchkoski did. Castillo did not know of the existence of Person D, let alone have a relationship with him. Kotchkoski did. Kotchkoski never discussed selling drugs with Castillo. Castillo would not know how to sell cocaine. He did not have the sources on the street to accomplish this. Kotchkoski did. Kotchkoski kept Castillo in the dark about what his plans were. He used Castillo and others to hide his involvement in illegal activities. It is clear that Kotchkoski was testing Castillo, and possible grooming him to join in the illegal activities. At all times, Kotchkoski was Castillo's superior officer. Kotchkoski had all the decision-making authority. Kotchkoski planned the illegal activity without Castillo's knowledge.

Application Note 5 provides that §3B1.2(b)'s 2-level reduction for minor participants applies to defendants who are "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." This accurately describes Castillo's involvement. Thus, he is entitled to a two-level reduction.

## 6. Analytical Framework

### a. General Sentencing Considerations

As is now axiomatic, as a result of *Booker,* no longer are courts required to impose a sentence "within the range" as provided for in the United States Sentencing Guidelines and as previously required by 18 U.S.C. §3553(b)(1). Courts may now take into consideration the myriad of sentencing factor historically ignored under 18 U.S.C. §3553. The Supreme Court recently reaffirmed that the Guidelines constitute "the lodestone of sentencing." *Peugh v. United States,* 133 S. Ct. 2072, 2084 (2013). Accordingly, Supreme Court precedent has emphasized that, in sentencing an offender, the district court must engage in a specific multi-step process. Id. at 2080; *see also United States v. Langford*, 516 F.3d 205, 211 (3d Cir. 2008). "First, 'a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.'" *Peugh*, 133 S. Ct. at 2080 (quoting *Gall v. United States,* 552 U.S. 38, 49 (2007)) (emphasis added). Second, after correctly calculating the applicable guideline range, "[t]he district court must then consider the arguments of the parties and the factors set forth in 18 U.S.C. § 3553(a)."

The Supreme Court has explained that the court must decide, in its discretion, how much persuasive authority the guidelines should have in any case. *United States v. Kimbrough*, 128 S. Ct. 558, 564 (2007). In doing so, the Supreme Court made clear that post-*Booker*, the sentencing court has broad discretion to consider whether the applicable guideline adequately addresses the sentencing considerations set forth in section 3553(a). It is well-settled that the sentencing court may consider nearly every aspect of a particular case – and a particular defendant – in determining the appropriate sentence.

Except as noted above, the defense does not disagree with the calculation of the Guidelines as agreed to between the government and the defendant and as reflected in the PSI.

Initially, it must be stated that neither Mr. Castillo nor his family seeks to underestimate or downplay the nature, severity and gravity of the crime of conviction. The facts are the facts. Regardless of the motivation, exculpatory or explanatory factors involved, no one can escape the conclusion that Mr. Castillo stands before the court convicted of violating a federal statute. The gravity of the matter at hand is not underestimated by Mr. Castillo. However, it is respectfully requested that the Court consider, along with the United States Sentencing Guidelines, the particular circumstances of his offense.

The overriding principle and basic mandate of §3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary," to comply with the purposes of sentencing as set forth in §3553(a). The sufficient-but-not-greater-than-necessary requirement is often referred to as the "parsimony provision." This requirement is not just another factor to be considered along with the others set forth in Section 3553(a) — it sets an independent limit on the sentence. Neither the statute itself nor *United States v. Booker* suggests that any one of these factors is to be given greater weight than any other factor.

We would like to stress the importance of the parsimony provision of the 18 U.S.C. § 3553. That provision provides that "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. (Emphasis added). Thus, we posit that the Court is statutorily bound not to impose a sentence greater than what would be necessary to comply with the relevant sentencing provisions. "The 'parsimony provision' provides a sentence shall be 'sufficient, but not greater than necessary, to comply with the purposes set forth in [3553(a)(2) ].'" *United States v. Lazo*, 227 Fed. Appx. 882, 884 (11th Cir. 2007) (quoting 18 U.S.C. § 3553(a).

Indeed, the 6th Circuit has required the court to consider the parsimony principle to be considered in sentencing a defendant. *See, e.g. United States v. Peters,* 98 Fed. Appx. 449 (6th Cir. 2004); *See, Booker,* 543 U.S. at 233 ("We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."); see also, e.g., *Kimbrough v. United States*, 552 U.S. 85, 101, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (referring to clause as "overarching provision" that, post-*Booker,* "permits the court to tailor the sentence" to the individual defendant and crime in light of the goals of the Sentencing Reform Act of 1984) (citing *Booker*, 543 U.S. at 245-46); *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir.2008) (referring to sentencing purposes of § 3553(a) as "a tapestry of factors, through which runs the thread of an overarching principle" that is "sometimes referred to as the 'parsimony principle' ") (citing *Kimbrough*, 552 U.S. at 101); *United States v. Borho*, 485 F.3d 904, 912 (6th Cir.2007) ("[T]he guidepost for sentencing decisions post-Booker is the 'parsimony requirement[.]' "); cf. *United States v. Jones*, 460 F.3d 191, 195 (2d Cir.2006) ("Selection of an appropriate amount of punishment inevitably involves some degree of subjectivity that often cannot be precisely explained.").

To be sure, sentencing courts must still consider the Guidelines after *Booker*, but those advisory Guidelines are just one of seven (7) statutory factors that are pertinent to the Court's sentencing judgment. 18 U.S.C. §3553(a)(l) specifically requires the Court to consider Mr. Castillo's history and characteristics when imposing sentence. In *United States v. McConer*, 530 F.3d 484 (6th Cir. 2008), the Sixth Circuit held that there is no presumption of reasonableness in imposing a guideline sentence.

As a result of *Booker* and its progeny*,* no longer are courts *required* to impose a sentence "within the range" as provided for in the United States Sentencing Guidelines and as previously

required by 18 U.S.C. §3553(b)(1). Courts may now take into the myriad of sentencing factors explicit and implicit and historically considered under 18 U.S.C. § 3553. Initially, we would like to stress the importance of the parsimony provision of the 18 U.S.C. § 553. That provision provides that "The court *shall* impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection. (Emphasis added).

Thus, we posit that the Court is statutorily bound *not* to impose a sentence greater than what would be necessary to comply with the relevant sentencing provisions discussed be *United States v. Wilson*, 350 F.Supp.2d 910, (DC Utah 2005) the court stated, "It is possible to argue that this provision requires the courts to impose sentences below the Guidelines range, because Guidelines sentences are not parsimonious." *Id*. at 921. Indeed, Judge Cassell noted that it was certainly debatable that "the parsimony concept is powerful evidence ... that both the Senate and the House were attempting to pass a statute giving more substantial power to sentencing judges to impose a sentence outside the guidelines range." *Id.* at 923. "District court sentencing after *Booker* centers around 18 U.S.C. § 3553(a), which calls on the district court to 'impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection' and to 'consider' the [remaining § 3553(a)] factors ...." *see United States v. Castillo,* 460 F.3d 337, 354 (2d Cir.2006); *see also*, *United States v. Ministro-Tapia*, 470 F.3d 137 (2nd Cir. 2006). Indeed, the Second Circuit has stated that: "We have recognized that district courts are to impose sentences pursuant to the requirements of § 3553(a)-*including the requirements of § 3553(a)'s parsimony clause*-while appellate courts are to review the sentences actually imposed by district courts for reasonableness." *United States v. Williams,* 475, 476 F.3d 468, (2nd Cir 2007).(emphasis added).

We believe that a strong and persuasive argument exists that the parsimony provision of 18 U.S.C. §3553 requires that the Court impose the *minimum* sentence possible under the circumstances taking into account all of the 18 U.S.C. §3553(a) factors. Therefore, the Court should not - and cannot – impose a guideline sentence as recommended by the office of probation of 57 to 71 months if it concludes that a lesser sentence would be sufficient to satisfy the goals of punishment in the statute.  Mr. Castillo submits that a sentence of more than 36 months far exceeds the "necessary" punishment in this case. Indeed, in *United States v. Davis*, 458 F.3d 491, 496 (6th Cir. 2006), the Sixth Circuit held that the rationale for a variance must be compelling in proportion to the extent of the downward variance. As described above, the circumstances of Mr. Castillo's offense are quite unusual. Coupled with Mr. Castillo's "offender" characteristics, a substantial downward variance is appropriate.

In selecting the sentence in this case, the defendant agrees that the Court is bound by the statutory mandate of 18 U.S.C. §3553(a). The statute mandates that when determining the proper sentence to be imposed, the Court shall consider seven factors:

1.  the nature and circumstances of the offense and the history and characteristics of the defendant;
2.  the need for the sentence imposed –

   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.  the kinds of sentences available;
4.  the kinds of sentence and the sentencing range established for by the Guidelines
5.  any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced;

16

6. the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
7. the need to provide restitution to any victims of the offense.

With the exception of factor 5, 6 and 7 these considerations are addressed *in seriatim* below:

(i) **Offense Characteristics**

The nature of the offense, distribution of a controlled substance, is indeed serious. The societal harm associated with the illicit drug trade cannot be underestimated and Mr. Castillo makes no attempt to minimize the impact of the crime, not only on society, but on those individuals that may have used the drugs.  Additionally, Mr. Castillo appreciates that as a law enforcement officer, he held a position of trust that he violated.  The specific circumstances of his offense, as described in the Introduction, are unusual. Mr. Castillo asks that the Court consider the position he was in, with his lack of experience, which contributed immensely to his offense conduct.

Mr. Castillo committed serious criminal acts and the circumstances of those crimes evidence true culpability. He will not minimize the severity of his misconduct or the injury he has caused to the people of the State of Ohio.

(ii) **Offender Characteristics**

In addition to the offense conduct, 18 U.S.C. §3553(a)(l) also requires the Court to consider the "history and characteristics of the defendant."  Attached are many letters of support for John that describe him as a hard worker, a great husband, a respectful son, and a true friend.

(iii) **Seriousness of the Offense and Providing a Just Punishment**

18 U.S.C. §3553 also requires the Court to impose a sentence that reflects the seriousness of the offense, promote respect for the law and to provide a just punishment.

In analyzing the seriousness of the offense, one cannot avoid the obvious: Mr. Castillo stands before the court guilty of distributing a dangerous drug. The seriousness of his offense is compounded because as a law enforcement officer, this is the very activity he was sworn to investigate and stop on behalf of the citizens of his community. He recognizes the illegal and immoral nature of his actions and is prepared to face the punishment to be meted out. This notwithstanding, it is respectfully submitted that a recognition of the seriousness of the offense does not *necessarily* compel the imposition of a lengthy term of incarceration. An analysis of all of the sentencing factors, and sentencing policy, suggest that a sentence of 36 months can be imposed which does in fact recognize the seriousness of the offense.

**(iv)    Deterrance**

Deterrence to criminal conduct is also one of the major considerations embodied in 18 U.S.C. §3553. Certainly, the lessons learned do suggest that the consequences of criminal conduct are dire and often quite severe.

As a felon, the collateral consequences for Mr. Castillo are indeed severe. Absent an extraordinarily unlikely Presidential Pardon, he has lost his right to vote for at least 5 years; forever lost his right to serve on a federal jury (28 U.S.C. §1865(b)(5)); forever lost his right to possess any type of firearm (18 U.S.C. §§921 - 930,); largely disqualified for most state and federal employment; suffer specifically imposed occupational restrictions (18 U.S.C.§§3563(b)(5), 3583(d)); prohibited from obtaining most types of federal licensure (21 U.S.C. §862(d)(1)); precluded from obtaining employment with any type of federally recognized labor organization of employee benefit plan (29 U.S.C. §§504, 1111); may become ineligible for grants, licenses, contracts, public housing and other federal benefits, excluding retirement, welfare, Social Security, health and disability, (21 U.S.C.§ 862 and 42 U.S.C.

§1437f(d)(1)(B)(iii)); is no longer eligible to receive food stamps or temporary assistance to needy families, and the amount payable to any family or household of which such a person is a member is reduced proportionately (21 U.S.C. §§ 862a(a), (b), (d)(2); and his future international travel can and will be severely limited as many countries prohibit travel by felons.

However, the judicial system is well equipped to provide adequate means of deterrence for future criminal conduct.  By the imposition of a 36 month period of incarceration and lengthy period of supervision with special conditions the Court can fashion a punishment with systemic safeguards, For instance, monitored through the Office of Probation, the Court can require that Mr. Castillo inform any potential future employer of his crime; he can be required to submit to home confinement conditions; submittal of detailed financial statements and any other conditions that the court believes will adequately deter future criminal conduct.  Through the imposition of detailed special conditions, the Court, with the assistance of the Office of Probation, can certainly impose a sentence with adequate safeguards taking into consideration deterrence from criminal conduct absent an imposition of a lengthy term of incarceration.   There is little research---academic, judicial, anecdotal or otherwise--- that evens suggest that an imposition of incarceration deters crime. In fact, most research appears to suggest that the longer one is in prison, higher rates of recidivism result.

**(v)   Kinds of Sentences Available**

It is not surprising that there is a dearth of authority and academic study over the last 30 years discussing alternatives to incarceration as the United States Sentencing Guidelines typically did not permit a wide range of discretionary alternatives once certain Guideline levels were mathematically attained.  This Court, however, now has the discretionary authority to consider alternative sentences for Mr. Castillo. As discussed below, it is suggested that a lengthy

term of incarceration, **under these circumstances**, is the least effective method in achieving stated Congressional sentencing policy-----even under the previously determinate USSG sentencing system.

Certainly one of the primary purposes of our national sentencing policy and the Sentencing Reform Act of 1984 is rehabilitation. However, little documentary evidence exists to support the proposition that incarceration has any affect on rehabilitation whatsoever. A May 2004 study conducted by the United States Sentencing Commission belies the critical assumption that a period of incarceration for a first-time offender had any affect on rates of recidivism. *Recidivism and the First Offender*, United States Sentencing Commission May 2004. In fact, the conclusion of the study appears to point to the contrary: **The more involvement one had in the criminal justice system and the longer in prison, the higher the rate of recidivism**. An analysis of the study suggests that recidivism risk is **lowest** for those offenders with **least experience** in the criminal justice system. To some, these results are not surprising. In 2001, the Honorable Jack Weinstein of the Eastern District of New York pre-empted an explanation for this seeming anomaly:

> "It is not surprising that rehabilitation continues to be linked primarily with failed attempts to reform inmates while they are incarcerated. The great shortcomings of the American rehabilitative model have taken place in the context of incarceration. See, e.g., *Powell v. Texas*, 392 U.S. 514, 530, 88 S.Ct. 2145, 2153, 20 L.Ed.2d 1254 (1968) (plurality opinion) (Marshall, J.) ("[I]t can hardly be said with assurance that incarceration serves [therapeutic or rehabilitative] purposes ... for the general run of criminals"); Matthew W. Meskell, Note, *The History of Prisons in the United States from 1777 to 1877*, 51 Stan. L.Rev. 839 (1999) (eighteenth and nineteenth-century American penal system was founded on the philosophy of Dr. Benjamin Rush, who "argued that reformation and deterrence of crime ought to be

20

the sole goals of punishment, that the contemporary criminal codes tended to harden criminals and engender hatred towards the government, and that imprisonment should be used as the primary criminal punishment."

Indeed, it can be fairly argued that national sentencing policy is fostered not by mandating long periods of incarceration but by the utilization of alternatives to prison. The Sentencing Reform Act of 1984 has always provided sentencing judges with some level of flexibility to consider which of the core sentencing principles--retribution, deterrence, incapacitation, and rehabilitation--are most important in a particular case, and to provide alternatives to incarceration where necessary in carrying out statutory goals. These four core principles have guided sentencing policy and implementation in one form or another since at least 1984. See, e.g., Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 41 (1998). Indeed, the United States Sentencing Guidelines themselves, along with sound sentencing and penological philosophy, have always permitted the courts to view alternatives to prisons in appropriate and defined circumstances and to craft individual sentencing in appropriate cases. Historically, Congress recognized that the sentencing judge must have the flexibility to emphasize one purpose of sentencing over others based upon the individual circumstances of an offender and an offense. *See*, S.Rep. No. 98-225, at 58- 59 (1983) ("The intent ... is to recognize the four purposes that sentencing in general is designed to achieve, and to require that the judge consider what impact, if any, each particular purpose should have on the sentence in each case."). "The statute (SRA) gave the U.S. Sentencing Commission ... broad authority to structure sanctions, to permit judges to individualize sentences, to be parsimonious in the use of punishment, to use non-prison sentences for nonviolent first offenders, and to avoid overcrowding federal prisons." Note, *What Did the United States Sentencing Commission Miss?*

101 Yale L.J. 1773, 1773 (1992). In determining whether an alternative to lengthy incarceration is appropriate, courts have examined several general issues, including the risk a particular offender poses to the public, the harm caused by the crime, the defendant's prior criminal behavior, his or her likelihood of committing another crime and potential hardship to others. *Cf.* Model Penal Code § 7.01. Such alternatives for the court to consider are substantial periods of probation/supervised release, community service, drug and alcohol rehabilitation programs, home confinement, electronic monitoring or any combination of the above. Thus, it is suggested that this court can be highly consistent and in all probability, fashion a sentence for Mr. Castillo *sans* a period of incarceration exceeding 36 months and still protect and foster Congressional sentencing policy.

It is suggested that the Court consider imposing a sentence of 36 months and give Mr. Castillo the opportunity to seek the much needed and required reflection and punishment needed for moral rehabilitation.

**7. Effective Punishment**

Effective punishment accomplishes several important goals of the criminal justice system. Punishment of an individual defendant, deterrence of defendant and others from committing similar offenses and reflecting the seriousness of the crime are all legitimate goals of effective punishment.

One goal, however, of effective punishment is the reformation and preparation of sending a defendant back into society. One of the keys to effective punishment must be weighed by the position the defendant is in when he gets out of prison and back into society. Ultimately, reformation should go hand in hand with punishment. Punishment too severe or harsh will frustrate this goal of returning a defendant to society at the appropriate time after a sufficient

period of punishment has passed. Incarceration beyond this point is incarceration merely for the sake of incarceration and the mere human warehousing of an individual. While this may satisfy a "lust" for punishment, an unduly harsh punishment of overly lengthy incarceration will frustrate the overall purpose of the criminal justice system. Mr. Castillo faces a lengthy term of incarceration. This should not be where a defendant has no prior criminal record, no history of violence and a low likelihood of repeat behavior. Mr. Castillo respectfully requests this Honorable Court to consider this factor prior to imposing a sentence upon him. Mr. Castillo believes that effective sentencing can be accomplished with a term of probation without offending any principles of punishment, deterrence, or reflecting the seriousness of the crime. For purposes of individual deterrence, a sentence of 36 months will not have any greater deterrent effect on Mr. Castillo than a 60-month sentence. An unduly harsh sentence requiring a lengthy term of incarceration will not further impress upon Mr. Castillo the wrongfulness of his conduct or cause him to internalize the wrongfulness of his conduct any more or any less. A sentence as requested by Mr. Castillo will not harm any principles of deterrence.

For all of these reasons stated, Mr. Castillo's requested sentence is a fair, reasonable, equitable and balanced approach, both abstractly and specifically, to sentencing and all of the competing interests and consideration undertaken when imposing sentence. A sentence as requested by Mr. Castillo will punish him and deter him as a person who already has begun to walk the long road of rehabilitation and redemption. The ultimate goals of reformation and rehabilitation will also be accomplished with a sentence as requested by Mr. Castillo. Therefore, all goals of sentencing will be accomplished with a sentence as requested.

**8. Conclusion**

For the reasons arguments and law as stated herein, the defense respectfully requests that he court impose a term of incarceration not exceeding 36 months.

Respectfully submitted,

**/s/ Robert F. Krapenc**
ROBERT F. KRAPENC
Ohio Supreme Court No. 0040645
150 East Mound Street, Suite 310
Columbus, Ohio 43215
P: (614) 221-5252
F: (614) 224-7101
Bob@Krapenclaw.com
Counsel for Defendant

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been delivered via electronic mail service to the Assistant United States Attorney, 303 Marconi Blvd, Second Floor, Columbus, Ohio this 5th day of December, 2024.

__/s/ Robert F. Krapenc_____
ROBERT F. KRAPENC      (0040645)
Attorney for Defendant

24